IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 07-cv-00066-MSK-CBS

GREYSTONE CONSTRUCTION, INC.,
PETER J. HAMILTON,
THE BRANAN COMPANY,
CARL K. BRANAN,
MICHAEL C. BRANAN, and
AMERICAN FAMILY MUTUAL INSURANCE COMPANY,

        Plaintiffs,

v.

NATIONAL FIRE & MARINE INSURANCE COMPANY,

        Defendant.

_____

**OPINION AND ORDER GRANTING, IN PART, MOTIONS FOR
SUMMARY JUDGMENT**
_____

**THIS MATTER** comes before the Court pursuant to Plaintiffs Greystone Construction, Inc. and Peter Hamilton (collectively, "Greystone") and American Family Mutual Insurance Company's ("American Family") Motion for Partial Summary Judgment **(# 149)**, and Defendant National Fire & Marine Insurance Company's ("National Fire") response **(# 156)**; the parties' Joint Motion to Bifurcate Coverage Issues **(# 151)**; National Fire's Motion for Summary Judgment **(# 152)** as against all Plaintiffs, Plaintiffs The Branan Company, Carl Branan, and Michael Branan's (collectively, "Branan") and American Family's response **(# 155),** Greystone and American Family's response **(# 158)**; and Branan and American Family's Motion for Partial Summary Judgment **(# 153)**, and National Fire's response **(# 157)**.

1

# FACTS

The parties have stipulated (**# 150**) to the facts they believe are necessary to resolve the issues presented here. Greystone and Branan are both businesses engage in the construction of residential homes. Both Greystone and Branan have obtained commercial general liability insurance policies from both National Fire and American Family. As discussed in more detail below, both builders were named in construction defect lawsuits by purchasers of their homes, and both builders sought defense and indemnification against those suits by both National Fire and American Family. American Family ultimately tendered a defense to the builders in both suits, but National Fire refused to do so.

### The *Hull* suit

In 2001, Richard and Lisa Hull purchased a home constructed by Greystone. That home suffered property damage due to soil subsidence, water intrusion, and other instances of what the parties here agree was allegedly "poor workmanship." In 2005, the Hulls sued Greystone ("the *Hull* suit"), alleging that: (i) Greystone failed to recognize defects in the soil upon which the house was built, and (ii) that portions of the house were not adequately designed to withstand "abutting loads." The *Hull* suit asserted claims for negligence, negligent misrepresentation, violation of the Colorado Consumer Protection Act, breach of warranty, and other claims.

Upon being served with the *Hull* suit, Greystone contacted its insurers, National Fire and American Family. American Family agreed to undertake Greystone's defense of the claim, subject to a reservation of rights. However, National Fire refused to defend Greystone in the suit, relying primarily on endorsements to Greystone's policy: (i) excluding coverage for damage "incepting prior to" National Fire's coverage, (ii) requiring an insured to make an express

election among co-insurers of the company it wished to undertake defense of a suit, and (iii) providing that National Fire's coverage would be deemed in excess of any other coverage carried by the insured. In addition, National Fire reserved its right to invoke other endorsements, including one those excluding coverage for subcontractor actions and one relating to ground subsidence, among others.

Greystone, through American Family, ultimately settled the *Hull* suit for approximately $300,000.

### The *Giorgetta* suit

In 1999, Douglas and Sandra Giorgetta purchased a home from Branan. As with the Hulls, the Giorgetta's home began suffering property damage apparently relating to soil conditions, among other things. In 2006, the Giorgettas brought suit against Branan ("the *Giorgetta* suit"), alleging claims similar to those asserted by the Hulls against Greystone. Branan promptly notified both American Family and National Fire of the suit. American Family agreed to tender a defense to Branan, but National Fire refused. The parties' stipulation of facts does not identify the particular grounds upon which National Fire refused Branan's request for defense and indemnification.

Branan, through American Family, ultimately settled the *Giorgetta* suit by buying back the home for $565,000. Those funds were paid entirely by American Family.

In their Complaint **(# 1)** in this action, the Plaintiffs assert claims for: (i) declaratory relief, in that National Fire has a duty to both defend and indemnify (on a pro rata basis with American Family) both Greystone and Branan; (ii) contribution/equitable subrogation by American Family for the amounts paid in settlement of the *Hull* and *Giorgetta* suits; (iii) breach

of contract; (iv) bad faith breach of contract; and (v) violation of the Colorado Consumer Protection Act.

Pursuant to Fed. R. Civ. P. 42(b), the parties have agreed and jointly move to bifurcate **(#151)** questions requiring interpretation of policy language – in order to determine whether coverage exists for the *Hull* and *Branan* suits – from the remaining issues in this case. Based on the stipulated facts discussed above, Greystone/American Family, Branan/American Family, and National Fire all move for judgment in their favor on the issue of coverage.

As discussed below, it is not necessary to reach – and thus, not necessary to recite – the parties' respective positions on a variety of issues raised in the briefing. It is sufficient to note that, with regard to the first question of whether the *Hull* and *Giorgetta* suits alleged an "occurrence" falling within the general coverage provisions of the policies, National Fire's motion **(# 152)** argues that the suits essentially asserted "poor workmanship" as the cause of the property damage, and that "poor workmanship" does not constitute an accidental "occurrence" under the terms of the policies. Greystone's motion **(# 149)** argues that coverage was available for the *Hull* lawsuit because the general historical trend and majority rule in most states recognize faulty workmanship as being an "occurrence" covered by general liability policies. Branan's motion **(# 153)** raises similar arguments, incorporating many of Greystone's arguments by reference (and sometimes setting forth Greystone's arguments verbtaim), and specifically argues that the damages claimed in the *Giorgetta* suit constitute an "occurrence" under the policy.

## ANALYSIS

### A. Standard of review

Although nominally captioned as summary judgment motions, the parties here have stipulated to all of the facts necessary to resolve the question of policy interpretation and the scope of coverage, and thus, the normal inquiry prompted by summary judgment motions – the determination of whether a genuine factual dispute exists requiring trial – is not appropriate here. Rather, the Court merely applies the law to the undisputed facts and enters judgment as appropriate.

### B. Standards governing interpretation of policy language

Because this Court's subject-matter jurisdiction arises due to the diversity of citizenship of the parties, the Court applies Colorado's substantive law governing the interpretation of insurance policy language. *See Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 426-27 (1996). Under Colorado law, insurance policies are construed under the same traditional principles that govern the interpretation of any contract. *Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 613 (Colo. 1999).

When attempting to construe language in an insurance policy, the Court's ultimate goal is to ascertain and give effect to the reasonable expectations of the parties to the policy. *Pompa v. American Family Mut. Ins. Co.*, 520 F.3d 1139, 1143 (10th Cir. 2008). The strongest indication of the parties' reasonable expectations is the policy language itself, and thus, the Court's first step is to give effect to the plain and ordinary meaning of its terms, as those terms would be understood by a person of ordinary intelligence. *MarkWest Hydrocarbon, Inc. v. Liberty Mut. Ins. Co.*, 558 F.3d 1184, 1190 (10th Cir. 2009), *citing Farmers Ins. Exch. v. Dotson,* 913 P.2d 27,

30 (Colo. 1996); *Pompa*, 520 F.3d at 1143. In other words, the Court construes the policy language not as the insurer intended it to mean, but according to what the ordinary reader and purchaser would have understood it to mean. *Regional Bank of Colorado, N.A. v. St. Paul Fire & Marine Ins. Co.*, 35 F.3d 494, 496 (10th Cir. 1994). The same rules apply to provisions in insurance policies that exclude certain situations from otherwise available coverage; exclusionary terms must also be construed according to their plain and apparent meaning. *Worsham Contr. Co. v. Reliance Ins. Co.*, 687 P.2d 988, 990 (Colo. App. 1984). The Court must not construe terms of a policy in isolation; it must consider the policy as a whole. *Simon v. Shelter General Ins. Co.*, 842 P.2d 236, 239 (Colo. 1992).

When terms in a policy are susceptible to more than one reasonable interpretation, the Court must construe the ambiguous term against the drafter – the insurer – and in a manner that would promote, rather than deny, coverage. *Blackhawk-Central City Sanitation Dist. v. American Guarantee & Liab. Ins. Co.*, 214 F.3d 1183, 1191 (10th Cir. 2000). However, a term is not ambiguous simply because the parties disagree as to its meaning, or where hypothetical or abstract sets of facts create the potential of ambiguity. *Allstate Ins. Co. v. Juniel*, 931 P.2d 511, 513 (Colo. App. 1996).

The duty to defend and duty to indemnify are discrete obligations under an insurance policy, and are subject to differing analyses. A duty to indemnify arises only when the policy terms <u>actually</u> cover a judgment or settlement against an insured. *Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294, 299 (Colo. 2003). By contrast, a duty to defend arises when the underlying compliant against the insured alleges facts that might <u>arguably</u> fall within the terms of the policy. *Hecla Mining Co. v. New Hampshire Ins. Co.*, 811 P.2d 1083, 1089 (Colo. 1991).

An insurer disclaiming any duty to defend bears a "heavy burden" of showing that no set of facts consistent with those alleged in the underlying complaint could give rise to a situation where coverage existed under the policy. *Id.* at 1089, 1090.

### C. Whether the property damage constitutes an "occurrence"

The first issue on which the parties disagree is whether the damage to the Hull or Giorgetta properties constitutes the result of an "occurrence." The core policy language defining coverage in both the Greystone and Branan policies provides property damage "caused by an occurrence" falls within the scope of the policy. *Docket* # 150, ¶ 36. An "occurrence," in turn, is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.*, ¶ 37.

The parties have framed up this issue as largely a legal one: can property damage resulting from poor workmanship constitute an "occurrence" as that term is used in the policy? Although both the *Hull* and *Giorgetta* complaints contain, among other things, claims of defective design, misrepresentation, and deceptive trade practices, the parties' briefs appear to limit their arguments to the question of whether the policies cover damages arising out of poor workmanship.[1] National Fire's position is that an essential element of a general liability policy is that the damages insured against be "fortuitous," and extending coverage to the insured where the claimant alleges only poor workmanship would convert the general liability policy into a

---

[1] Greystone's motion makes a fleeting contention that "National Fire ignores the allegations of property damage from negligent repair and negligent misrepresentation," but does not elaborate on this argument. *Docket* # 149 at 8. To the extent Greystone intended to argue that the *Hull* suit involved more than just a claim of poor workmanship and that these non-workmanship claims also constitute an "occurrence," the Court finds that argument inadequately developed and does not consider it.

performance bond warrantying the insured's products. *Citing, among others, Union Ins. Co. v. Hottenstein*, 83 P.2d 1196, 1202 (Colo. App. 2003). The Plaintiffs' position is that while poor workmanship, standing alone, may not constitute an "occurrence," poor workmanship that results in property damage does fall within such coverage. *Citing Hoang v. Monterra Homes*, 129 P.3d 1028 (Colo. App. 2005), *rev'd on other grounds*, 149 P.3d 798 (Colo. 2007).

In February 2009, after the parties briefing, the Colorado Court of Appeals decided *General Security Indemnity Co. of Arizona v. Mountain States Mutual Casualty Co.*, 205 P.3d 529 (Colo. App. 2009), which greatly clarified the issue. In *General Security,* interpreting identical policy language to that presented here, the court noted that a split existed among jurisdictions as to "whether a defective workmanship claim, standing alone, is an 'occurrence' under CGL [Commercial General Liability] policies." *Id.* at 534. It found that the majority of jurisdictions held that "claims of poor workmanship, standing alone, are not occurrences that trigger coverage," while the minority rule was "damage resulting from faulty workmanship is an accident, and thus, a covered occurrence." *Id.* at 535. The court also observed a "corollary" to the majority rule: that even when faulty workmanship is the cause, an "occurrence" is present "when consequential property damage has been inflicted upon a third party as a result of the insured's activity." *Id.* The *General Security* court concluded that the majority rule was most consistent with prior Colorado and 10th Circuit caselaw and properly accounted for the necessary element of fortuity. 205 P.3d at 535. The court distinguished *Hoang*, one of the primary cases relied upon by the Plaintiffs here, finding it "unpersuasive" in several respects. *Id.* at 536-537.

After adopting the majority rule – that faulty workmanship alone cannot give rise to an "occurrence" – the *General Security* court then turned to the question of the corollary. Finding

that the complaints of property damage in the underlying suit did not "allege[ ] any damage beyond the work product" of the insured,[2] the court concluded that the corollary did not apply. *Id.* at 537. Thus, the court found that the policy did not impose a duty on the insurer to defend the underlying suit. *Id.* at 538.

With a small exception, *General Security* effectively resolves the parties' dispute here as to whether poor workmanship can constitute an "occurrence" under a general liability policy. The rule derived from *General Security* is that a claim alleging poor workmanship does not constitute an "occurrence" under that policy language (the same language present here) unless that claim alleges consequential property damages running to third parties. Perhaps anticipating Colorado's adoption of the majority rule, the Plaintiffs argue that the *Hull* and *Giorgetta* suits fall within what *General Security* ultimately referred to as the "corollary." Specifically, the Plaintiffs argue that the *General Security* rule applies only when there are allegations of poor workmanship that nevertheless result in no material property damage (e.g. "over-driven nails"). The Plaintiffs here contend that the corollary is invoked – and coverage extends – when the poor workmanship results in actual property damage to the work product itself. Here, the Plaintiffs argue, the poor workmanship has resulted in actual property damage to the Hull and Giorgetta homes, and thus, the poor workmanship here constitutes a fortuitous "occurrence."

---

[2]*General Security* involved a claim against the insurer of a subcontractor responsible for framing of windows and door installations and installation of siding. The *General Security* court noted that the underlying suit alleged poor workmanship on the part of the subcontractor, such as "over-driven nails for the attachment of the horizontal hardboard siding," but observed that these allegations "describe potential defects in the work product itself, not additional or consequential property damage." *Id.* at 538. The underlying suit did allege some forms of actual property damage, such as "cracking of interior flooring materials (tile, etc.) from structural foundation movement," but the court observed that the window and door subcontractor could not possibly be deemed to be at fault for such damages. *Id.*

9

A close reading of *General Security* and the cases it relies upon reveals the Plaintiffs' position to be untenable.  It is clear from both the discussion in *General Security* and those cases it cites that the "damage inflicted on a third party" necessary to invoke the corollary refers to faulty workmanship causing property damage to something <u>other than</u> the work product itself. *Id.* at 535, *citing J.Z.G. Resources, Inc. v. King*, 987 F.2d 98, 102 (2d Cir. 1993) ("this circuit has held that a CGL policy did not provide coverage for a claim against an insured for the repair of faulty workmanship that damaged only the resulting work product").  In other words, under the corollary, poor workmanship that resulted in property damage only to the home itself would not be considered an "occurrence," but poor workmanship that resulted in damage to, say, personal property of the homeowner kept inside the house or damage to neighbor's houses could be considered an "occurrence."  *J.Z.G.*, 987 F.2d at 102 (distinguishing a case in which coverage was found when poor workmanship "caused damage to <u>other</u> property of the purchaser") (emphasis added); *see also Auto-Owners Ins. Co. v. Home Pride Companies, Inc.*, 684 N.W.2d 571, 545 (Neb. 2004) ("a standard CGL policy does not provide coverage for faulty workmanship that damages only the <u>resulting work product</u>, if faulty workmanship causes bodily injury or property damage to <u>something other than the insured's work product</u>, an unintended and unexpected event has occurred, and coverage exists") (emphasis added), *cited in General Security*, 205 P.3d at 535.

With this rule in mind, this Court turns to the complaints in the *Hull* and *Giorgetta* suits to see whether the plaintiffs there claimed to have suffered damage to anything other than the homes – the work products – that Greystone and Branan had built.  The complaint in the *Hull* suit makes reference to damage to "living areas, . . . the porch, patio, garage, and driveway."

*Docket* # 150, ¶ 5(9). It makes a reference to the Hulls "los[ing] the use of parts of their Home because of the property damage," and later, conclusorily recites "damages including, by way of illustration, actual property damage, consequential loss of use of the value of their Home, and other direct economic costs, repair costs, and aggravation, inconvenience, annoyance, discomfort, and/or emotional distress." *Id.*, ¶ 5(10), (16). Nothing in the *Hull* complaint gives an indication that the Hulls were claiming property damage to anything other than the house itself.[3] Accordingly, because the parties agree that the *Hull* suit focused only on poor workmanship, and the stipulated facts yield no indication of property or consequential damage to anything other than Greystone's work product (i.e. the home) itself, the rule in *General Security* requires a conclusion that the *Hull* suit did not, on its face, involve an "occurrence" under the terms of the policy, and thus, National Fire had neither the duty to defend nor indemnify Greystone or American Family with regard to that suit.

The allegations in the complaint of the *Giorgetta* suit are slightly more expansive than in the *Hull* suit, but no more availing. The *Giorgetta* complaint alleges that the homeowners suffered "movement of the basement floor system, damage to and movement of the foundation, damage to the upper level living areas, and damage to porches, patios, garage, and driveway." *Docket* # 150, ¶ 32(14). It also recites damage to or the loss of use of "some or all of the Home," due to "improper installation of the building envelope system and related building envelope

---

[3] The Hulls' conclusory recitation of various types of "consequential" or other damages is insufficient to permit the corollary to be invoked. *General Security*, 205 P.3d at 538 (refusing to find that "conclusory allegations of consequential damages trigger a duty to defend" and stating that "allegations [that] contain nothing substantive about the extent or nature of the property damages" do not convert a claim of poor workmanship into a covered "occurrence").

failures, as well as resulting and consulting and consequential property damage to other elements of the Home's construction." *Id.*, ¶ 32(16). As in the *Hull* suit, the Giorgettas claimed a conclusory litany of injuries, including "property damage, diminished value of the Home, costs of repairs, loss of improvements, loss of use of all or portions of the Home, aggravation, inconvenience, annoyance, and discomfort and other consequential damages." *Id.*, ¶ 32(23). As with the Hulls, the *Giorgetta* suit's specific claims of injury all relate to property damage to the home itself, not to any of the Giorgetta's personal property or to the property of third parties. Once again, the *Giorgetta* suit makes conclusory references to "consequential damages," but fails to provide specifics by which National Fire or this Court could ascertain what those damages were and whether they involved something other than Branan's work product. Accordingly, property damage only to the home itself is insufficient to remove the *Giorgetta* suit from the general rule that poor workmanship does not constitute an "occurrence" sufficient to create a duty to defend or indemnify under the National Fire policy.

Because the Court has determined that neither the *Hull* nor *Giorgetta* suits fell within the policy's general language extending coverage for "occurrences," the Court need not reach the remaining arguments regarding the policy's endorsements.

## CONCLUSION

For the foregoing reasons, the parties' Joint Motion to Bifurcate Coverage Issues **(# 151)** is **GRANTED**. Greystone/American Family's Motion for Partial Summary Judgment **(# 149)** and Branan/American Family's Motion for Summary Judgment **(# 153)** are **GRANTED IN PART**, insfoar as the Court determines that there is no genuine issue of fact requiring a trial, and **DENIED IN PART**, insofar as neither Greystone, Branan, or American Family are entitled to

judgment given the parties' stipulated facts.   National Fire's Motion for Summary Judgment **(#152)** is **GRANTED** in its entirety.  Judgment in favor of National Fire and against all Plaintiffs shall enter contemporaneously with this Order.

Dated this 18th day of August, 2009

**BY THE COURT:**

*[signature: Marcia S. Krieger]*

Marcia S. Krieger
United States District Judge